# ILLINOIS OFFICIAL REPORTS

## Supreme Court

*Nowak v. City of Country Club Hills*, 2011 IL 111838

| | |
|---|---|
| Caption in Supreme Court: | DON NOWAK, Appellee, v. THE CITY OF COUNTRY CLUB HILLS, Appellant. |
| Docket No. | 111838 |
| Filed | December 1, 2011 |
| Held<br><br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | An injured police officer's employer does not become statutorily obligated to pay the entire health insurance premium for him and his family until it is determined that he will never return to work because of permanent disability caused by a catastrophic injury, *i.e.*, when he is awarded a line-of-duty disability pension. |
| Decision Under Review | Appeal from the Appellate Court for the First District; heard in that court on appeal from the Circuit Court of Cook County, the Hon. Loretta Eadie-Daniels, Judge, presiding. |
| Judgment | Appellate court judgment reversed; circuit court judgment affirmed. |

| Counsel on Appeal | John B. Murphey, of Rosenthal, Murphey, Coblentz & Donahue, of Chicago, for appellant. |
| | |
| | Franklin A. Celani, of Mokena, for appellee. |
| | |
| | Brian Day and Roger Huebner, of Springfield, for *amicus curiae* the Illinois Municipal League. |
| | |
| Justices | JUSTICE THOMAS delivered the judgment of the court, with opinion. |
| | Chief Justice Kilbride and Justices Freeman, Garman, Karmeier, Burke, and Theis concurred in the judgment and opinion. |

**OPINION**

¶ 1    This case presents the following question: When a police officer suffers a catastrophic injury in the line of duty, when does the officer's employer become statutorily obligated to pay the entire health insurance premium for the injured officer and his family? The circuit court of Cook County held that the obligation attaches upon a determination that the officer is permanently disabled and therefore never returning to work. The appellate court held that the obligation attaches when the officer sustains the actual injury. 406 Ill. App. 3d 837. We agree with the circuit court.

¶ 2                                   BACKGROUND

¶ 3    Plaintiff, Don Nowak, worked as a full-time law enforcement officer for the City of Country Club Hills (the City). He was also a member of the local police union, which had entered into a collective-bargaining agreement with the City. The collective-bargaining agreement provided that the City would offer a health insurance plan for all police officers and that officers choosing to participate in the plan would pay 20% of the applicable insurance premium. Plaintiff chose to participate in the plan, and the City regularly deducted 20% of the applicable premium from his paycheck.

¶ 4    On August 21, 2005, plaintiff was injured in the line of duty while attempting to make an arrest. He never returned to work as a police officer. For 12 months following the date of his injury, plaintiff received 100% of his salary, as required by section 1(b) of the Public Employee Disability Act (PEDA) (5 ILCS 345/1 (West 2004)). For a short time thereafter, he continued to receive his full salary and benefits through a combination of accrued sick and vacation time, two weeks' light duty, and temporary total disability payments under the Workers' Compensation Act (820 ILCS 305/1 *et seq.* (West 2006)). During the 12 months that plaintiff received his full salary under PEDA, the City continued to deduct 20% of the

applicable health insurance premiums from his paycheck, in accordance with the collective bargaining agreement. After plaintiff's PEDA benefits expired, plaintiff continued to participate in the City's health insurance plan and continued to pay 20% of the applicable health insurance premiums to the City on a monthly basis.

¶ 5        In February 2008, plaintiff applied for disability benefits. On October 14, 2008, the City's police pension board (the Board) awarded plaintiff a line-of-duty disability pension under the Illinois Pension Code (See 40 ILCS 5/4-110 (West 2004)), effective September 1, 2006. The City immediately began paying 100% of plaintiff's health insurance premiums, as required by section 10(a) of the Public Safety Employee Benefits Act (PSEBA) (820 ILCS 320/10(a) (West 2006)).

¶ 6        Following the Board's decision, plaintiff requested reimbursement from the City for the health insurance premium contributions he had paid since the date of his injury. The City refused plaintiff's request. Plaintiff then filed a civil complaint seeking reimbursement of those contributions. The parties submitted a stipulation of facts and filed cross-motions for summary judgment. The circuit court denied plaintiff's motion and entered summary judgment in favor of the City.

¶ 7        Plaintiff appealed, and the appellate court reversed. 406 Ill. App. 3d 837. We granted the City's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Feb. 26, 2010). In addition, we allowed the Illinois Municipal League to file an *amicus curiae* brief on behalf of the City. Ill. S. Ct. R. 345 (eff. Sept. 20, 2010).

¶ 8                                    ANALYSIS

¶ 9        This case is governed by section 10(a) of PSEBA, which in relevant part provides:

> "An employer who employs a full-time law enforcement *** officer *** who *** suffers a catastrophic injury or is killed in the line of duty shall pay the entire premium of the employer's health insurance plan for the injured employee, the injured employee's spouse, and for each dependent child of the injured employee until the child reaches the age of majority ***." 820 ILCS 320/10(a) (West 2004).[1]

The parties here agree that plaintiff suffered a catastrophic injury in the line of duty. In addition, the parties agree that, in light of that injury, the City is obligated under section 10(a) to pay the entire health insurance premium for plaintiff and his family. The sole point of contention is, When did the City's obligation under section 10(a) attach? The City argues that it attached on October 14, 2008, when the Board determined that plaintiff would never be returning to work and therefore awarded him a line-of-duty disability pension. Plaintiff argues that the City's obligation attached on August 21, 2005, the date he sustained his injury. We agree with the City.

---

[1] In *Krohe v. City of Bloomington*, 204 Ill. 2d 392, 398-400 (2003), this court explained that, as used in section 10(a), the term "catastrophic injury" means an injury that, like plaintiff's here, results in a line-of-duty disability pension under the Illinois Pension Code.

¶ 11    The fundamental rule of statutory construction is to ascertain and give effect to the legislature's intent. *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 503-04 (2000). The best indication of legislative intent is the statutory language, given its plain and ordinary meaning. *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469, 479 (1994). Where the language is clear and unambiguous, we must apply the statute without resort to further aids of statutory construction. *Davis v. Toshiba Machine Co., America*, 186 Ill. 2d 181, 184-85 (1999). However, if the statutory language is ambiguous or unclear, this court may look beyond the act's language to ascertain its meaning. *In re D.D.*, 196 Ill. 2d 405, 419 (2001). A statute is ambiguous if it is capable of more than one reasonable interpretation. *County of Du Page v. Illinois Labor Relations Board*, 231 Ill. 2d 593, 604 (2008). The construction of a statute is a question of law that we review *de novo*. *Ries v. City of Chicago*, 242 Ill. 2d 205, 216 (2011).

¶ 12    The problem in this case arises from the fact that section 10(a) is utterly silent as to when an employer's obligation under that section attaches.[2] The reason this is problematic is that there are at least two points in time at which that obligation could attach. The first is that suggested by plaintiff, namely, the date on which the officer actually suffers his injury. Indeed, section 10(a) requires employers to pay the entire health insurance premium for an officer who "*suffers* a catastrophic injury *** in the line of duty" (emphasis added). In this case, no one disputes that plaintiff's injury was "suffered" on August 21, 2005, and therefore it is reasonable to suggest that this would be the date upon which the City's obligations under section 10(a) attached. However, a second and equally reasonable option exists, and that is the one proffered by the City, namely, the date on which the officer is declared permanently disabled and awarded a line-of-duty disability pension. Indeed, section 10(a) requires employers to pay the entire health insurance premium for an officer who "suffers a *catastrophic* injury *** in the line of duty" (emphasis added). As noted above, "catastrophic injury" is a term of art, and it means an injury that results in the awarding of a line-of-duty disability pension. See *Krohe*, 204 Ill. 2d at 398-400. In this case, although plaintiff suffered an injury on August 21, 2005, that injury was not declared "catastrophic" until October 14, 2008, when the Board concluded that plaintiff would never return to work and therefore awarded him a line-of-duty disability pension. Thus, it is equally reasonable to suggest that October 14, 2008, is the date upon which the City's obligations under section 10(a) attached, as prior to that date, plaintiff's injury was not, legally speaking, "catastrophic."

¶ 13    Given that both of these readings of section 10(a) are reasonable, and given that section 10(a) simply does not speak to when an employer's obligation under that section attaches, we conclude that section 10(a) is ambiguous on this point. See *People v. Marshall*, 242 Ill. 2d 285, 297 (2011) (statute's silence rendered the statute ambiguous). We therefore may turn to extrinsic aids of statutory construction, including both legislative history (*Krohe*, 204 Ill. 2d at 398) and well-established rules of construction (*People v. Easley*, 119 Ill. 2d 535, 539

---

[2]Plaintiff himself concedes in his brief that section 10(a) "does not specify when the employer is obligated to start paying benefits."

(1988)).

¶ 15    We begin with the legislative history and debates, which are "[v]aluable construction aids in interpreting an ambiguous statute." *Advincula v. United Blood Services*, 176 Ill. 2d 1, 19 (1996). PSEBA began its life as House Bill 1347 (the Bill), which was sponsored by Representative Art Tenhouse and introduced to the Illinois House of Representatives on March 5, 1997. On April 14, 1997, just prior to the Bill's third reading, Representative Tenhouse explained to his colleagues:

> "1347 is a simple Bill. It simply provides that full-time law enforcement officers and firefighters that are killed or disabled in the line of duty, we're going *to continue* the health benefits for the officer's children and spouse." (Emphasis added.) 90th Ill. Gen. Assem., House Proceedings, April 14, 1997, at 180 (statements of Representative Tenhouse).

Following the conclusion of these remarks, the Bill passed by a vote of 113 to 4. Similarly, immediately prior to the Illinois Senate's initial vote on the Bill, the Bill's Senate sponsor, Senator Laura Kent Donahue, advised her colleagues:

> "And what this does is that it provides that for full-time law enforcement officers and firefighters that are killed or disabled in the line of duty *shall continue* the health benefits for the officer or the firefighter, their spouses and their children." (Emphasis added.) 90th Ill. Gen. Assem., Senate Proceedings, May 16, 1997, at 192 (statements of Senator Donahue).

Following these remarks, the Senate passed the Bill by a vote of 53 to 1. On October 28, 1997, immediately prior to the House's vote to override Governor Edgar's veto of the Bill, Representative Tenhouse again reminded the chamber:

> "House Bill 1347 *** [p]rovides that employers of full-time law enforcement and firefighters who are killed or disabled in the line of duty, *shall continue* health benefits for the officer or fire fighter and the spouse and children, thereof." (Emphasis added.) 90th Ill. Gen. Assem., House Proceedings, October 28, 1997, at 16 (statements of Representative Tenhouse).

Following these remarks, the Bill once again was passed, this time by a vote of 115 to 1. And finally, on November 14, 1997, immediately prior to the Senate's veto override vote, Senator Donahue reminded the chamber:

> "I'm requesting a vote to override the Governor's veto of House Bill *** 1347. What the original bill did was it provided for *the continued* health insurance coverage for full-time law enforcement officers and firefighters that are catastrophically injured in the line of duty." (Emphasis added.) 90th Ill. Gen. Assem., Senate Proceedings, November 14, 1997, at 136 (statements of Senator Donahue).

Senator Donahue then continued:

> "I'd like to say for the sake of the record what we mean by catastrophically injured. What it means is that it is our intent to define 'catastrophically injured' as a police

officer or firefighter who, due to injuries, has been forced to take a line-of-duty disability." *Id*.

At the conclusion of Senator Donahue's remarks, the Senate overrode the Governor's veto by a vote of 58 to 1.

¶ 16 The foregoing remarks demonstrate that the purpose of PSEBA is to "continue" the provision of employer-sponsored health insurance coverage for an officer and/or the family of an officer who is either killed or "catastrophically injured" in the line of duty. And Senator Donahue's November 14 remarks establish that a "catastrophically injured" officer is one who "due to injuries, *has been forced* to take a line of duty disability." (Emphasis added.) See *Krohe*, 204 Ill. 2d at 398-400 (finding same). Senator Donahue's use of the present perfect verb tense is highly instructive, in that it indicates the action in question–in this case, being forced into retirement due to an injury suffered in the line of duty–is a *fait accompli*; it already has happened. According to the relevant legislative history, then, PSEBA was enacted to protect officers who *already* have been forced into retirement by a line-of-duty injury. It provides a *postemployment* benefit, designed to ensure that the termination of an officer's employment, whether by death or by injury, does not likewise precipitate the termination of his or her family's employer-sponsored health insurance coverage. This is how the legislative sponsors understood PSEBA, and it is how we understand it as well.

¶ 17 Notably, this reading of PSEBA makes perfect sense from a public policy standpoint. Again, according to PSEBA's legislative sponsors, one of PSEBA's primary purposes is to continue the provision of employer-sponsored health insurance coverage for officers and the families of officers who, due to a line-of-duty injury, have been forced to take a line-of-duty disability pension. That is, PSEBA ensures a continuation of health insurance coverage *following the termination of the officer's employment*. The reason this makes sense is that, unless and until the officer's employment is terminated by the awarding of a line-of-duty disability pension, he remains an employee of the municipality in question and therefore fully eligible for all employee benefits, including his employer-sponsored health insurance coverage. In other words, prior to the awarding of a line-of-duty disability pension, an injured officer's employer-sponsored health insurance coverage would "continue" whether or not PSEBA was on the books. In this case, for example, plaintiff was paid his full salary for the first 12 months following the date of his injury, as mandated by PEDA. Following that 12-month period, and for the remainder of the time leading up to the Board's October 14, 2008, decision, plaintiff received temporary total disability payments under the Workers' Compensation Act. And throughout both periods–that is, while receiving PEDA benefits and while receiving workers' compensation benefits–plaintiff remained an employee of the City, continued to pay his 20% health insurance premium contribution per the collective-bargaining agreement, and was never without his employer-sponsored health insurance coverage. It was not until October 14, 2008, when the Board awarded plaintiff a line-of-duty disability pension, that plaintiff's employment with the City terminated. This was the very first moment that, absent special statutory protection, plaintiff's eligibility to receive City-sponsored health insurance coverage would have expired. And it is therefore not surprising that this is also the precise moment when, according to PSEBA's sponsors, PSEBA kicks in. Again, this makes perfect sense from a public policy standpoint, and for this reason as well,

we are satisfied that our reading of section 10(b) is the correct one.

¶ 18                                Canons of Construction

¶ 19     We next consider canons of statutory construction. This court has long held that "statute[s] creating a new liability must be strictly construed in favor of persons sought to be subjected to its operation." *Anderson v. Board of Education of School District No. 91*, 390 Ill. 412, 422 (1945). Similarly, "statutes in derogation of the common law are to be strictly construed in favor of persons sought to be subjected to their operation." *Barthel v. Illinois Central Gulf R.R. Co.*, 74 Ill. 2d 213, 220 (1978). There is no question that, when section 10(a) was enacted in 1997, it created a new liability that was unknown at common law. Indeed, there is no common law right to employer-provided health insurance at all, let alone fully subsidized employer-provided health insurance, as section 10(a) mandates. Consequently, this court's obligation under well-settled principles of statutory construction is to construe that mandate strictly and in favor of the party subject to its operation.

¶ 20     Of the two possible readings of section 10(a), it is the City's reading that construes section 10(a) strictly and in favor of the party subject to its operation. Indeed, the City's reading fully vindicates PSEBA's purpose by ensuring that an injured officer's employer-sponsored health insurance coverage continues despite the termination of employment due to a line-of-duty disability. At the same time, the City's reading ensures that the cost of providing the mandated benefit is as low as possible for the injured officer's employer, as the obligation to assume 100% of the injured officer's health insurance premium does not attach until the officer's employment is formally terminated. By contrast, plaintiff's reading of section 10(a) confers the maximum conceivable benefit that the statutory silence will permit, thereby ensuring that the cost of complying with PSEBA will be as high as possible for those subject to it. Plaintiff is effectively inviting this court to construe section 10(a) liberally and in favor of its intended beneficiary, the very opposite of what our canons of construction compel. For obvious reasons, we decline plaintiff's invitation and abide by our conclusion.

¶ 21     At the same time, this court has long held that statutes should be construed in such a way as to avoid "impractical or absurd results." *People ex rel. Lyerly v. Missouri Pacific R.R. Co.*, 328 Ill. 504, 509 (1927). We cite this principle because, while plaintiff's reading of section 10(a) might not prove absurd, it will almost certainly prove impractical. As *amicus* correctly points out, while the date of injury in this case is undisputed and easy to identify, there are cases in which the date of injury will be difficult, if not impossible, to pin down. This is because, in other cases, the condition that renders the officer permanently disabled will result not from a discreet, one-time injury but rather from the accumulation of several prior injuries or the aggravation of a preexisting injury or condition. For example, in *Kellan v. Board of Trustees of the Firemen's Pension Fund*, 194 Ill. App. 3d 573 (1990), a firefighter suffering from herniated disks in his neck and back was awarded a line-of-duty disability pension despite the fact that none of the testifying experts could identify the precise injury or trauma that caused that condition. The evidence in that case showed that the firefighter had suffered no less than nine separate injuries over the course of a 19-year career, and his treating

physician's testimony was that "any one or a combination of the plaintiff's injuries could have resulted in the herniation." *Id.* at 577. Similarly, one of the board-appointed examiners testified that, " 'based on the number of injuries presented by him as work-related injuries *** and the medical history, I felt it was more likely than not that these injuries played a major cause in his herniated nucleus pulposus.' " *Id.* at 578. In other words, although both of these experts were convinced that the herniated disks were work-related, neither could say with any degree of certainty which of the firefighter's many injuries caused that condition. See also *Gloss v. Board of Trustees, Firemen's Pension Fund*, 132 Ill. App. 2d 736 (1971) (firefighter awarded line-of-duty disability pension where long-term inhalation of smoke aggravated firefighter's preexisting lung ailment).

¶ 22      Plaintiff does not suggest, and we cannot discern, how a "date of injury" reading of PSEBA would operate in cases such as *Kellan* and *Gloss*, where there is no "date of injury" but instead only the onset or aggravation of a disabling condition over time. By contrast, the City's reading of PSEBA, which ties PSEBA benefits not to the "date of injury" but to a declaration that the officer is permanently disabled and therefore eligible for a line-of-duty disability pension, remains perfectly workable even in cases such as these.


¶ 23                              Appellate Court's Decision

¶ 24      The appellate court reached the opposite conclusion, holding that, under PSEBA, the City's obligation to pay the entire cost of plaintiff's employer-sponsored health insurance premium attached on August 21, 2005, the date of plaintiff's injury. 406 Ill. App. 3d at 841. Obviously, we disagree with that conclusion, and it is therefore worth explaining where we disagree with the appellate court's analysis.

¶ 25      The appellate court's analysis begins with the concession that "section 10(a) *** does not specify when its benefits become effective." *Id.* at 839. Nevertheless, the court goes on to conclude that, as to when PSEBA benefits become effective, "the language contained in *** the PSEBA *** is *** clear and unambiguous." *Id.* at 841. The way the court gets from silence on the crucial point to clear-and-unambiguous on the crucial point is by explaining that section 10(a) contains "no explicit prohibition against the 'retroactive payment' of health insurance benefits under the PSEBA for the period of time from the date of the disabling accident to the pension board's decision that the officer is eligible for a disability pension." *Id.* Stated differently, the court's conclusion that PSEBA benefits attach on the date of injury was based on the fact that there is "nothing in the language of [PSEBA] to indicate that the legislature did not intend to confer such a benefit." *Id.*

¶ 26      There are two related problems with the appellate court's analysis. The first is the appellate court's invocation of what we might term a "double-negative presumption." The appellate court effectively held that, because section 10(a) does not say that an injured officer's PSEBA benefits do not attach on the date of injury, this must mean that they do. The problem with using this double-negative presumption is that it allows courts arbitrarily to assign meaning to a silent statutory text, simply by framing the double negative in a certain way. Here, for example, the appellate court just as easily could have reasoned that, because section 10(a) does not say that an injured officer's PSEBA benefits do not attach upon the

determination that the officer is permanently disabled and therefore eligible for a line-of-duty disability pension, this must mean that they do. And under this latter approach, of course, the City would win. In reality, then, the appellate court's approach is not so much an instrument for *ascertaining* the meaning of a silent statute as it is an instrument for *commanding* the meaning of a silent statute, which of course is not the role of the judiciary. Accordingly, it is not an approach we can endorse.

¶ 27        As importantly, the appellate court's application of the double-negative presumption in this case runs directly afoul of this court's well-established rule that "statute[s] creating a new liability must be strictly construed in favor of persons sought to be subjected to its operation." See *Anderson*, 390 Ill. at 422. Again, the appellate court could have framed the double-negative presumption just as easily in a way that favored the City as in a way that favored plaintiff. By choosing to frame it in a way that favored plaintiff, the court ensured a reading of PSEBA that would confer the maximum possible benefit on its beneficiaries while imposing the maximum possible cost on its subjects. That is exactly the opposite of what our canons of construction compel, and for the same reasons we rejected plaintiff's attempts in this regard, we reject the appellate court's as well.

¶ 28                                         CONCLUSION

¶ 29        For the reasons set forth above, we conclude that, under section 10(a) of PSEBA, an employer's obligation to pay the entire health insurance premium for an injured officer and his family attaches on the date that it is determined that the officer's injury is "catastrophic"–that is, on the date it is determined that the injured officer is permanently disabled and therefore eligible for a line-of-duty disability pension.

¶ 30        We therefore reverse the judgment of the appellate court and affirm the judgment of the circuit court.

¶ 31        Appellate court judgment reversed;

¶ 32        circuit court judgment affirmed.