# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

*People ex rel. T-Mobile USA, Inc. v. Village of Hawthorn Woods*, 2012 IL App (2d) 110192

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS *ex rel.* T-MOBILE USA, INC., Plaintiff-Appellee, v. THE VILLAGE OF HAWTHORN WOODS, Defendant-Appellant (Ross Hugi, Defendant). |
| District & No. | Second District<br>Docket No. 2-11-0192 |
| Filed | March 8, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In an action challenging defendant village's annexation of land on which plaintiff had constructed a communications tower, the appellate court upheld the trial court's ruling that the ordinances passed by the village forcibly annexing the land were invalid due to the improper use of a water feature that did not constitute a "creek" as a boundary in violation of section 7-1-13 of the Illinois Municipal Code, since the finding that the water feature was man-made was not against the manifest weight of the evidence based on the expert testimony and exhibits presented. |
| Decision Under Review | Appeal from the Circuit Court of Lake County, No. 09-MR-26; the Hon. Christopher C. Starck, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Daniel C. Shapiro and James L. Oakley, both of Thompson Coburn LLP, of Chicago, for appellant. |
| | |
| | Jennifer J. Gibson, of Zukowski, Rogers, Flood & McArdle, of Crystal Lake, for appellee. |

| Panel | JUSTICE BOWMAN delivered the judgment of the court, with opinion. Presiding Justice Jorgensen and Justice Schostok concurred in the judgment and opinion. |

**OPINION**

¶ 1    At issue in this case is the validity of ordinances passed by defendant the Village of Hawthorn Woods (Village), that forcibly annexed land adjacent to the Village in unincorporated Lake County. Part of the land was owned by defendant Ross Hugi, who was added to the case as a necessary party. Prior to the passage of the ordinances, Hugi had leased a portion of his property to plaintiff, T-Mobile USA, Inc. (T-Mobile), to construct a wireless communications tower. T-Mobile filed suit against the Village, alleging that two of the ordinances were invalid because they improperly used as a boundary a water feature that did not constitute a "creek," in violation of section 7-1-13 of the Illinois Municipal Code (65 ILCS 5/7-1-13 (West 2008)). The trial court agreed and entered judgment in T-Mobile's favor. We affirm.

¶ 2                    I. BACKGROUND

¶ 3    On July 23, 2008, T-Mobile entered into a lease with Hugi to construct a wireless communications tower on his property. On October 15 and 21, 2009, Lake County issued T-Mobile permits to construct the tower. However, construction did not begin because on November 22, 2008, the Village adopted three separate ordinances sequentially annexing three parcels of land in unincorporated Lake County, including the land on which the tower was to be built. Each parcel was less than 60 acres, in conformance with section 7-1-13. Ordinance No. 1263-08 annexed a 16.5-acre parcel of land bounded by the Village and the centerline of the west branch of Indian Creek. Ordinance No. 1264-08 annexed a 44.4-acre parcel bounded by the newly incorporated Village land under the previous ordinance and the "CENTERLINE OF AN UNNAMED CREEK TRIBUTARY OF THE WEST BRANCH OF INDIAN CREEK." Last, ordinance No. 1265-08 annexed a 39.4-acre parcel bounded by the centerline of the unnamed creek tributary and the Village. Hugi owned about 44 acres within the first and second parcels, and the property leased to T-Mobile was within the second parcel.

¶ 4    According to documents in the record, the alleged creek tributary (hereinafter referred

-2-

to as "water feature") at issue begins at Gilmer Road, which is a two-lane highway running northwest to southeast. The water feature begins at a culvert in the road and runs somewhat perpendicular to the road. The water feature then turns sharply and heads east until it intersects with a pond. The water feature can be roughly described as having a "hockey stick" shape, with the portion beginning at Gilmer Road being the blade and the east-west leg being the shaft.

¶ 5                                                    A. T-Mobile Files Suit

¶ 6        On January 12, 2009, T-Mobile filed a petition for leave to file a complaint to challenge the annexation. The trial court granted T-Mobile leave to file the complaint on January 21, 2009. T-Mobile filed an amended, two-count complaint on July 14, 2010. Count I, sounding in *quo warranto*, alleged as follows. Shortly after the annexation, the Village advised T-Mobile that its Lake County permits were no longer valid and that T-Mobile would need Village permission before constructing the tower. Lake County similarly advised T-Mobile that, in light of the annexation, it was abdicating jurisdiction over the parcel and ceding it to the Village. T-Mobile requested that the Lake County State's Attorney or the Illinois Attorney General bring a *quo warranto* action against the Village, but those offices declined. The water feature referenced in the subject ordinances did not form a legal boundary because it was not a "creek" within the meaning of section 7-1-13. Therefore, the Village's adoption of the ordinances violated the statutory requirement that municipalities cannot forcibly annex contiguous parcels of more than 60 acres. Count I sought an order finding the ordinances void. Count II sought a declaratory judgment that, regardless of the ordinances' validity, T-Mobile had a vested right to build its tower based on the building permits previously issued by Lake County, which established a nonconforming use under the Village's code.

¶ 7        On August 31, 2010, the trial court ordered that the trial would proceed only on count I, with count II being stayed pending further order.

¶ 8                                                    B. Trial
¶ 9                                               1. Village's Expert

¶ 10       The trial took place on November 1 and 3, 2010. Christopher Burke was accepted as an expert for the Village and provided the following testimony. He had a Ph.D. in civil engineering and was the president of Christopher Burke Engineering, which had about 200 employees. He and his firm had provided engineering services to about 45 municipalities. The Village hired him in fall 2008 as a consulting engineer, and he prepared plats of annexation for the subject ordinances. Prior to annexation, the 100.3 acres at issue were totally surrounded by incorporated land in the Village. The plats referred to the water feature as the "APPROXIMATE CENTERLINE LOCATION OF AN UNNAMED CREEK TRIBUTARY OF THE WEST BRANCH OF INDIAN CREEK FROM AERIAL PHOTOGRAPHY." The firm used three or four aerial photographs from Lake County's Geographic Information System in identifying the approximate centerline. The firm had prepared many plats of annexation and had never, to his knowledge, specifically noted on the plat itself which aerial photograph was relied on. In his experience, it was appropriate and

reasonable to rely on such aerial photographs.

¶ 11    The water feature currently drained the roadside ditches of Gilmer Road and the Rambling Hills Subdivision across the street. The water feature was present in a Lake County aerial photograph dating from 1939; it may also have been present before that time, but aerial photographs of the site before 1939 did not exist. The water feature also appeared in subsequent Lake County aerial photographs from 1946, 1974, 1993, 2000, 2002, and 2004 to 2008. In 1939, the water feature was much shorter because it ran from Gilmer Road directly to the west branch of Indian Creek, and the water feature did not have its east-west leg. The west branch of Indian Creek was subsequently relocated sometime between 1939 and 1946. After that, the water feature ran under Gilmer Road, across the property, close to the "remnants of the west branch of Indian Creek," and eventually flowed to and met the west branch of Indian Creek. It became more pronounced in the photographs over time. There were "improvements" to the water feature to accommodate the "180 some odd acres that [were] trying to drain downhill into the site." The Rambling Hills subdivision would have further increased the volume of water in the water feature. The water feature was "not carved by the glaciers" and "man has been involved with the modification of it," the same way that the relocation of the west branch of Indian Creek had "taken place by man." Over time, the water feature had "been maintained and drenched [*sic*]."

¶ 12    Burke originally viewed the site from the ground, without entering the property, to make sure that he was comfortable calling it a creek. He later visited the site in person in 2010 and took pictures. He did not see any field tiles during his visit.

¶ 13    Burke defined "creek" as:

"a water feature that is a naturally occurring swale or depression or engineered channel that carries fresh or estuarine water either seasonally or year round. A creek must include all of the following three features: (1) hydrologic connectivity, (2) presence of a channel form, and (3) topographic position. A creek begins at the first point at which these features are met."

Burke had investigated the definition of "creek" and settled on a definition given in an Oakland, California, ordinance. He agreed that the Oakland ordinance was designed to protect water features from further degradation and did not have anything to do with annexation. Burke did not think that the dictionary definitions were precise or specific enough, and he believed that this situation called for a more technical and scientific definition. The water feature at issue was a creek because it met his definition over the course of its length. It had hydraulic connectivity because it flowed from upstream to downstream, and it had a "low spot" (topographic position). Burke agreed that it fanned out as much as 30 feet in an area of dense vegetation, and the water was very shallow there, but he opined that it still remained a creek because "the flows [were] still making their way through this channel." Burke agreed that there were other water features near the water feature at issue that he would not call creeks. They did not have "the topography location" or "low spot" required for a creek. He believed that water going through a farm drainage system, buried storm water system, or, in some cases, a roadside ditch, could be called a creek if there were a creek upstream or downstream. For example, Addison Creek had areas where large storm

sewers under blocks of buildings were used to extend the creek, which came out of the other side.

¶ 14    Burke did not believe that a creek had to be "natural" or carved by glaciers to be labeled as a creek. In the Chicagoland area there were hundreds of situations where waterways were altered by man, such as being extended or having "laterals constructed to facilitate the drainage of properties." Engineers and water resource professionals still commonly referred to those as creeks. Chicagoland area maps also "show[ed] examples" of man-made channels being referred to as creeks. The water feature at issue was shown on a 1997 "Flood Insurance Rate Map" for Lake County, which was prepared by the Federal Emergency Management Agency (FEMA). Burke agreed that the water feature was not identified as a creek on any map issued by Lake County or the state or federal government. To his knowledge, the west branch of Indian Creek was labeled as a creek on such documents. Burke testified that his firm had prepared maps for municipalities, such as those relied on by T-Mobile's expert, showing the absence of the water feature, but such maps were not intended to be all-inclusive or all-encompassing.

¶ 15                               2. T-Mobile's Expert

¶ 16    T-Mobile presented Gary Schaefer as its expert, and he testified as follows. He was the president of Hey and Associates, a professional water resources engineering and ecological consulting firm. He had an undergraduate degree in civil engineering and a master's degree in water resources engineering.

¶ 17    An 1840 plat of survey of the area depicted the west branch of Indian Creek but not the water feature. Schaefer did not see any evidence of a surface drainage feature in the 1939 aerial photograph. A "white area" on the photograph would have been "farmers' access," and there could have been agricultural drain tile there. Drain tiles were used for draining wetlands for agricultural purposes. There was some "darkening" on the photograph that could indicate wetland vegetation. A 1946 Lake County aerial photograph also showed a "lighter" area. Again, there was no clear aboveground drainage feature shown, though there could have been underground drain tile. United States Geological Survey maps from 1966 and 1992 showed the west branch of Indian Creek but not the water feature. The same was true for a 1982 FEMA floodplain map; a 2002 Lake County surface hydrology study map; and a 2008 Lake County Storm Water Management Commission watershed map. The 2008 map showed a wetland area where the water feature exists. Excluding the aerial photographs, the only published document Schaefer found showing the water feature was a 1997 FEMA flood insurance rate map.

¶ 18    Schaefer identified a 1975 plat for the Rambling Hills subdivision. He opined that the subdivision's water runoff created "a possible need for expansion and a creation of" the water feature. Schaefer agreed that the water feature had been present since 1974. Photographs of the water feature after 1974 showed that it was more enhanced. A 1993 Lake County aerial photograph showed, unlike the earlier aerial photographs, a very defined straight line in the water feature from Gilmer Road, which then intersected another straight line running east. The line flowed to a pond that flowed to the west branch of Indian Creek.

This showed that the water feature was "essentially created to provide capacity to drain in a very clear route between Gilmer Road and the west branch of Indian Creek." The water flowed from the subdivision through a culvert under Gilmer Road to the water feature. Water draining from Gilmer Road also went through the culvert.

¶ 19     Schaefer made field inspections on July 14 and October 12, 2010. On July 14, he looked at both sides of the culvert on Gilmer Road and saw a few inches of standing water. He followed the path of the water feature and saw a channel where the ground rose up and then fell away sharply on either side. He interpreted this as evidence of "ditching," where people dug a ditch and "sidecast the spoil materials." Fifty to one-hundred feet in he saw pieces of terra cotta pottery, which he believed to be smashed drain tile. After about 100 feet from the road the channel became undefined and disappeared into a wetland area of vegetation and standing water. On his October 12 visit, Schaefer began at the pond northeast of the water feature. After 50 to 100 feet, it also spread out into a wetland area covered in standing water and dense vegetation, and any semblance of a ditch disappeared. To go through the wetland area, a person would need hip boots and a machete. Schaefer examined the Gilmer Road culvert area again during the October 12 visit, and this time it was dry. Still, most of the area around the length of the water feature was wetland.

¶ 20     In determining what constituted a creek, Schaefer applied a dictionary definition of a "creek" being " '[a] natural stream of water normally smaller than and often tributary to a river.' " He also looked at a United States Geological Survey publication that defined "stream" as water flowing in a natural channel as opposed to a canal. Schaefer opined that a creek must be natural, flow above the ground, flow in an open conduit, be smaller than a river, and flow to a river. Schaefer opined that the water feature was not a "creek" within the meaning of section 7-1-13 because it was man-made rather than natural. Schaefer believed that the water feature was man-made because it had a linear form, it was not shown on the various aforementioned hydrology maps, and it was not present in the 1939 aerial photograph. Further, the "sidecasting" and tile shards indicated that there was probably a drain tile constructed that was subsequently widened into a drainage ditch to provide additional capacity.

¶ 21     Schaefer opined that a creek would have to have been carved by glaciers or otherwise created naturally, and man-made extensions of a natural creek would not qualify. He agreed that the west branch of Indian Creek was a creek, even though it had been relocated by man. He believed that, if the creek was natural to begin with, it would still constitute a creek even if it was relocated; moving a natural body of water around was distinct from creating a body of water wherever one chose. Schaefer agreed that man-made water features could be shown on maps and that it was possible for maps to have oversights and not show creeks. He agreed that his site visits were more limited than Burke's. Schaefer also agreed that Indian Creek had wetland qualities but remained a creek; the chief difference to him was that Indian Creek was continuously visible on aerial photographs.

¶ 22                                   C. Trial Court's Ruling
¶ 23     The trial court entered a 35-page memorandum decision and order on February 17, 2011.

It found as follows, in relevant part. The portion of the water feature perpendicular to Gilmer Road was about 300 feet long, and the portion of the water feature that turned and went east toward the pond was about 600 feet long. Case law in Illinois distinguished between natural and artificial water features, particularly in drainage cases. Consistent with Burke's testimony, Illinois case law showed that creeks are often moved or enclosed. Such cases supported the proposition that creeks are natural bodies of water, because they hold that landowners are entitled to restoration of the natural flow of water that was disrupted by changes to creeks. There was some case law support for the proposition that an artificial water feature could become natural over time, but those cases were more focused on prescriptive rights than on defining terms applicable to water features. Thus, "[o]n the whole the case law reflect[ed] a long-standing distinction between natural waterways, such as creeks, and man-made channels, such as ditches," consistent with the dictionary definition referring to creeks as natural. An examination of various statutes showed that the legislature had been careful to distinguish between natural and man-made waterways. The legislature had also referred to creeks when it intended to and had referred to ditches in the appropriate context. As such, the statutes also suggested that a creek was a natural water feature.

¶ 24    The trial court found the Oakland ordinance unhelpful in determining the legislature's intent in using the word "creek," and it declined to adopt Burke's suggested definition. The trial court found that the plain and ordinary meaning of creek was "a natural watercourses [*sic*] or a watercourse that has been modified, but is of natural origin." It found it appropriate to construe section 7-1-13 to require that a creek used as an annexation boundary be natural.

¶ 25    The trial court further determined that the water feature was man-made instead of natural, based on the following findings. The 1939 aerial photograph showed no evidence of a creek or a ditch connecting the Gilmer Road culvert to the west branch of Indian Creek. It was unclear whether the water feature was present in the 1946 aerial photograph. In contrast, the 1993 aerial photograph, and to a lesser extent the 1974 aerial photograph, showed clear evidence of a straight route heading northeast from Gilmer Road that connected with the east-west leg of the water feature. The faint line on the 1939 aerial photograph was about half as long, and that photograph also showed, according to Burke, that the water feature's east-west leg did not exist at that time. The apparently unnaturally straight lines of the water feature when it first appeared in aerial photographs was additional evidence that it was dug out and man-made. Although it was not perfectly straight in later photographs, the meanderings could have been due to the passage of time, which spanned over 30 years, and lack of maintenance of the engineered channel. Further, the westward extension of the east-west leg apparent in the 1974 photograph, and the spur from that extension that appeared to drain into a small pond, strongly suggested that the water feature was created to improve drainage. Double lines visible in the 1974 photograph were consistent with Schaefer's testimony that he saw evidence of spoil piles along the water feature near Gilmer Road. Both experts testified that the flow of water from the subdivision would have increased the amount of water entering the water feature. Although the subdivision plat was not approved until 1975, the water feature could have been dug in anticipation of the construction of buildings in the subdivision, especially considering that the 1974 photograph showed the existence of subdivision streets not present in the 1946 photograph. The expert witnesses also agreed that

the water feature was not wholly natural.

¶ 26 The trial court ruled that, in sum, the evidence showed that the water feature was man-made rather than either a natural water feature or a natural water feature that had merely been improved or altered. Thus, it was not a creek within the meaning of section 7-1-13, and the Village did not meet its burden of proving compliance with the statute. Accordingly, Village ordinance Nos. 1264-08 and 1265-08, which used the centerline of the water feature as its boundary, did not comply with the statute and were void. The trial court granted judgment in favor of T-Mobile on count I and entered an Illinois Supreme Court Rule 304(a) (eff. Feb. 26, 2010) finding that there was no reason to delay the appeal of its ruling. The Village timely appealed.

¶ 27                                    II. ANALYSIS

¶ 28 This appeal deals with count I of T-Mobile's complaint, which was brought *quo warranto*. A *quo warranto* proceeding is the proper means by which to challenge an annexation that has been accomplished. *People ex rel. Ropac v. City of Edwardsville*, 345 Ill. App. 3d 414, 416 (2003). The authority to annex arises solely from the annexation statute, and a purported annexation is a nullity if it does not strictly comply with the statute. *People ex rel. City of Leland Grove v. City of Springfield*, 193 Ill. App. 3d 1022, 1035 (1990). In a *quo warranto* action, the defendant has the burden to prove that all elements of its annexation were proper and in compliance with the annexation statute. *People ex rel. Ropac*, 345 Ill. App. 3d at 416.

¶ 29 Section 7-1-13 of the Illinois Municipal Code states, in relevant part: "Whenever any unincorporated territory containing 60 acres or less, is wholly bounded by *** (b) one or more municipalities and a creek in a population of 400,000 or more *** that territory may be annexed by any municipality by which it is bounded in whole or in part ***." 65 ILCS 5/7-1-13(a) (West 2008).

¶ 30 In construing a statute, the fundamental rule is to ascertain and give effect to the legislature's intent. *Nowak v. City of Country Club Hills*, 2011 IL 111838, ¶ 11. The best indication of that intent is the statute's language when given its plain and ordinary meaning. *Id.* Where the statute's language is clear and unambiguous, we must apply it without resorting to other statutory construction aids. *Id.* Statutory construction is a question of law that we review *de novo*. *Id.*

¶ 31 The question here is what constitutes a "creek" under section 7-1-13. The Village argues that the trial court erred by reading the word "natural" into the annexation statute, because the statute does not specify that any of the boundaries mentioned must be natural. Rather, the Village maintains, the statute permits both natural and unnatural boundaries, such as municipal and state boundaries. The Village also contends that some boundaries, such as lakes and creeks, can be both natural and man-made.

¶ 32 The statute itself does not define the term "creek." Where terms are not defined, courts "will look at a dictionary to give the terms their ordinary and popularly understood meaning." *LeCompte v. Zoning Board of Appeals*, 2011 IL App (1st) 100423, ¶ 29. Webster's Dictionary defines "creek" as, among other things: "[(1)] *chiefly Brit*: a small inlet or bay

-8-

narrower and extending farther into the land than a cove: a narrow recess in the shore of the sea, a river, or a lake ***[;] [(2)] a saltwater estuary ***[; and (3)] a natural stream of water normally smaller than and often tributary to a river." (Emphasis in original.) Webster's Third New International Dictionary 533 (1986). Here, the first two definitions do not apply, and we are left with the definition of a creek as "a *natural* stream of water normally smaller than and often tributary to a river." (Emphasis added.) *Id.*; see also Merriam Webster Online Dictionary (2010), *available at* http://www.merriam-webster.com/dictionary/creek (last visited Feb. 2, 2012) (containing same definition); *United States v. Brink*, 795 F. Supp. 2d 565, 578 (S.D. Tex. 2011) (applying same definition). Although the statute itself does not contain the word "natural," the plain meaning of the word "creek" requires a natural water feature. Thus, we conclude that the term "creek" as used in section 7-1-13 unambiguously connotes a natural rather than man-made water feature.

¶ 33    The Village argues that we should use the definition of "creek" contained in *Snuggery Pub, Inc. v. Village of Mount Prospect*, 176 Ill. App. 3d 119 (1988). That case dealt with the amendment to section 7-1-13 that allowed municipalities to annex territory bounded by creeks, in addition to the previously provided-for boundaries of rivers and lakes. *Id.* at 122. The plaintiff argued that the term "creek" rendered the amendment vague and therefore unconstitutional. *Id.* at 121. The plaintiff argued that the term "creek" was susceptible to too many interpretations and that creeks could not be used as boundaries because they are not stable and do not have permanent positions. *Id.* at 125.

¶ 34    The appellate court quoted Black's Law Dictionary's definition of a "creek," stating, "A creek is '[a] small stream less than a river. The term imports a recess, cove, bay or inlet in the shore of a river and not a separate or independent stream.' " *Id.* at 125 (quoting Black's Law Dictionary 335 (5th ed. 1979)). The court stated that rivers also change directions, flood their banks, or move, but they have been used as boundaries. *Id.* at 126. The court stated that the creek at issue was readily discernable from the plat of annexation and the description, and, under the circumstances, the term "creek" was not so undefinable or unascertainable that the General Assembly had to define what would constitute a creek. *Id.*

¶ 35    The Village argues that *Snuggery Pub* established the legal standard for use of creeks as annexation boundaries under the statute, requiring only that a creek be readily ascertainable on a plat of annexation.

¶ 36    We note that the issue in *Snuggery Pub* was whether the term "creek" was unconstitutionally vague. "A statute is unconstitutionally vague and violates due process if it fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute or if there is an absence of standards restricting the discretion of governmental authorities who apply the law." *Owens v. Department of Human Rights*, 403 Ill. App. 3d 899, 928 (2010). Statutory terms cannot be so poorly defined that their meaning is determined at whim instead of by objective criteria. *Id.* Still, mathematical certainty is not required, and a statute will not be deemed unconstitutionally vague based on hypothetical scenarios that call into question the meaning of some terms. *Id.* A statute is unconstitutionally vague on its face only where it is not capable of any valid application. *Morgan v. Department of Financial & Professional Regulation*, 374 Ill. App. 3d 275, 298 (2007).

¶ 37    Thus, the *Snuggery Pub* court essentially determined that the term "creek" was not facially invalid, nor was it invalid as applied to the particular creek at issue, whose boundaries were easily apparent on the plat of annexation. The *Snuggery Pub* court included a definition of the word "creek" in its analysis, but it faced a broader question than we have here, which is whether a particular water feature constitutes a creek in the first place. *Snuggery Pub* also did not involve the issue of whether a man-made water feature could be a creek. Moreover, *Snuggery Pub* relied on Black's Law Dictionary in defining the word "creek." *Snuggery Pub*, 176 Ill. App. 3d at 125. However, Black's Law Dictionary has not included the term "creek" for over a decade, decreasing the reliability of that source for the term. Compare Black's Law Dictionary 370 (6th ed. 1990) (defining "creek") with Black's Law Dictionary (7th ed. 1999) (not including "creek") and Black's Law Dictionary (9th ed. 2009) (same). Accordingly, here we do not apply *Snuggery Pub*'s recitation of the definition of "creek."

¶ 38    The Village also argues that the trial court erred in relying on inapplicable statutes and case law to interpret the annexation statute. Regardless of the trial court's reasoning, we review the question of statutory interpretation *de novo* (*Nowak*, 2011 IL 111838, ¶ 11), and we have determined that the plain meaning of the word "creek" unambiguously requires that it be natural. Where a statute's language is clear and unambiguous, we must apply it without using other aids of statutory construction. *Id.*; see also *Balmoral Racing Club, Inc. v. Topinka*, 334 Ill. App. 3d 454, 460-61 (2002) (construing a statute *in pari materia* with other statutes relating to similar subjects as an extrinsic tool to aid in interpreting an ambiguous statute).

¶ 39    The Village next argues that the trial court erred in concluding that the water feature was not natural. On this issue, the Village first maintains that, regardless of its origins, the feature's 80-year existence rendered it natural as a matter of law. Questions of law are reviewed *de novo*. *Department of Transportation v. Lowderman, LLC*, 367 Ill. App. 3d 502, 504 (2006). T-Mobile argues that the Village forfeited this issue by failing to raise it in the trial court. Issues not raised in the trial court are forfeited on appeal. See *Gatreaux v. DKW Enterprises, LLC*, 2011 IL App (1st) 103482, ¶ 25. However, forfeiture is a limitation on the parties rather than this court's jurisdiction (see *id.*), and we choose to address the argument because the trial court itself raised the issue in its ruling.

¶ 40    The Village relies primarily on *Wallis v. Country Mutual Insurance Co.*, 309 Ill. App. 3d 566 (2000), and *Alderson v. Fatlan*, 231 Ill. 2d 311 (2008), in support of its argument. In *Wallis*, the issue was whether water overflowing from a man-made channel constituted a "flood," thereby invoking an exception to coverage in a homeowner's insurance policy. *Wallis*, 309 Ill. App. 3d at 568-69. This court stated, "if a permanent, man-made watercourse has a defined bed, visible banks, and a recurrent flow of water, it should be considered a natural watercourse if it has been maintained for a sufficient length of time." *Id.* at 573. We stated that the watercourse next to the property had all of the characteristics of a natural watercourse, and therefore the water overflowing from it constituted a flood under the plain and ordinary meaning of the term. *Id.* at 573-74.

¶ 41    We find the Village's reliance on *Wallis* unpersuasive, as the question in that case was the plain meaning of the word "flood." This court ultimately determined that a watercourse

that had a defined bed, visible banks, and a recurrent flow of water could "flood" regardless of whether the watercourse was man-made or natural. *Id.* at 574. We did not discuss the plain meaning of the word "creek" and whether a man-made watercourse could be a creek.

¶ 42　　In *Alderson*, the issue was whether the plaintiffs were entitled to riparian rights on a man-made lake. *Alderson*, 231 Ill. 2d at 312. Case law provided that all owners of a private, nonnavigable lake bed would have riparian rights to the surface waters of the entire lake. *Id.* at 316. The appellate court held that the water-filled quarry at issue was not a lake because it was not of natural origin, and therefore the plaintiffs did not have riparian rights over the surface waters. *Id.* at 317. Our supreme court stated that artificial bodies of water can be treated as natural in some situations, in part based on the difficulties of distinguishing a body of water's origin and, more fundamentally, on the principles of fairness and equity. *Id.* at 322. However, the supreme court also stated that, at a minimum, such a rule could apply only in situations where the party invoking the rule had relied upon the use of the artificial body of water without dispute for a long time. *Id.* at 323.

¶ 43　　Thus, aside from the fact that *Alderson* involved riparian rights, it does not help the Village's argument that the water feature should be treated as natural, because the Village had never previously relied on the use of the water feature or its characterization as a creek.

¶ 44　　Last, the Village argues that the record does not contain any evidence that the water feature was man-made. We will accept the trial court's factual findings and reverse them only if they are against the manifest weight of the evidence. *Peeples v. Village of Johnsburg*, 403 Ill. App. 3d 333, 340 (2010). A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident or the finding is arbitrary, unreasonable, or not based on the evidence. *Id.*

¶ 45　　The Village argues that the trial court misinterpreted the 1939 aerial photograph as showing that there was no creek or ditch connecting the culvert on Gilmer Road to the west branch of Indian Creek. The Village cites this court's decision in *People v. Sven*, 365 Ill. App. 3d 226, 231 (2006), for the proposition that we apply *de novo* review to analyzing photographs because the trial court was not in a superior position to view them. We note that *Sven* dealt with whether an image was "lewd" within the meaning of the child-pornography statute, so the alleged crime was contained within the image itself, which the reviewing court could observe firsthand, with no need to defer to the trial court. See *id.* The situation in *Sven* stands in contrast to that in *People v. Valle*, 405 Ill. App. 3d 46 (2010), where this court reviewed the voluntariness of a defendant's confession. The defendant argued that we should review the entire issue *de novo* because we had the interrogation video and were equally situated with the trial court in deciding the issue of whether his confession was voluntary. *Id.* at 56. This court disagreed, stating that we would defer to the trial court's findings of fact because live testimony had a role in resolving a disputed issue of fact, and the video was not entirely dispositive of the issue. *Id.* at 58.

¶ 46　　The situation in the instant case is more similar to *Valle* than to *Sven*. The photographs are not dispositive of the question of whether the water feature was man-made or natural; there was disputed expert testimony on the origins and nature of the water feature, including disputed testimony on what the photographs themselves showed. Accordingly, while we will

consider the Village's arguments regarding what the photographs reveal, we will not independently analyze and comment on each photograph. Instead, we will consider whether the trial court's finding that the water feature was man-made is against the manifest weight of the evidence as a whole.

¶ 47    In addition to arguing that the 1939 photograph shows a watercourse running from Gilmer Road to the west branch of Indian Creek, the Village argues that the trial court erred in finding that man-made alterations to the water feature showed that it must have been created by man at some point after 1939. The Village argues that, because the creek appears in the 1939 photograph, its rerouting and alterations do not render it man-made or provide evidence that it was originally made by man. The Village further maintains that the trial court's suggestion that the water feature was dug to facilitate drainage for the Rambling Hills subdivision is contrary to the evidence. The Village argues that even Schaefer testified that the water feature could be seen in the 1974 photograph, but the subdivision plat was not approved until 1975. The Village additionally argues that the trial court failed to take into account the water feature's topographic position. The Village argues that the lands north of Gilmer Road are at a higher elevation, and they slope down from Gilmer Road toward the west branch of Indian Creek. The Village contends that such topography means that the water "must have always flowed" down in this manner, rendering the water feature natural.

¶ 48    We conclude that the trial court's finding that the water feature was man-made is not against the manifest weight of the evidence. As T-Mobile points out, this question boiled down to a classic "battle of the experts," with Schaefer opining that the water feature did not exist until 1974, was dug by man to drain water from a subdivision, and did not have the characteristics of a creek. Burke, in contrast, opined that the water feature had been present since at least 1939 and had all of the characteristics of a creek. As the trier of fact, it was the trial court's role to resolve conflicts in the evidence, assess witnesses' credibility, and determine what weight to give to their testimony. *Helping Others Maintain Environmental Standards v. Bos*, 406 Ill. App. 3d 669, 692-93 (2010).

¶ 49    The trial court's acceptance of Schaefer's opinion, after its own extensive review of the evidence, was not arbitrary or unreasonable. Almost all of the maps of the area examined by the experts did not show the water feature. We recognize that this absence alone would not necessarily negate the water feature's existence at the time of the maps' charting, and the Village relies primarily on the aerial photographs. However, the 1939 and 1946 photographs are far from clear and could arguably show, as Schaefer testified, agricultural drain tile or a farmer's access rather than a surface drainage feature. The proposition that agricultural drain tile had existed was also supported by Schaefer's testimony that he saw terra cotta pieces that could have been smashed drain tile. Thus, it is not readily apparent that the water feature was channeled out by surface water that had "always" flowed down from north of Gilmer Road. Schaefer opined that the water feature could have been dug out to allow for the drainage of the subdivision, and he pointed to evidence of "sidecasting." Although the Village correctly points out that the subdivision plat was not approved until 1975 whereas the water feature is visible in the 1974 photograph, the trial court recognized this distinction and stated that the water feature could have been dug in anticipation of the construction of subdivision buildings, especially considering that the 1974 photograph showed the presence of

-12-

subdivision streets not visible in the 1946 photograph. The water feature's straight lines lend additional support to the conclusion that it was man-made.

¶ 50    Based on all of the evidence presented at trial, including the expert testimony and numerous exhibits, the trial court's finding that the water feature was man-made is not against the manifest weight of the evidence. Accordingly, the water feature is not a "creek" within the meaning of section 7-1-13, and the trial court correctly ruled that the Village did not meet its burden of proving compliance with the statute for ordinance Nos. 1264-08 and 1265-08, rendering those ordinances void.

¶ 51                                    III. CONCLUSION

¶ 52    For the foregoing reasons, we affirm the Lake County circuit court's judgment.

¶ 53    Affirmed.