2018 IL App (3d) 170189

Opinion filed September 11, 2018

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2018

| | | |
|---|---|---|
| *In re* MARRIAGE OF | ) | Appeal from the Circuit Court |
| | ) | of the 10th Judicial Circuit, |
| JULIE A. SCHMIDGALL, | ) | Tazewell County, Illinois. |
| | ) | |
| Petitioner, Third-Party Plaintiff-Appellee, and Cross-Appellant, | ) | |
| | ) | |
| and | ) | Appeal No. 3-17-0189 |
| | ) | Circuit No. 12-D-559 |
| TROY T. SCHMIDGALL, | ) | |
| | ) | |
| Respondent | ) | |
| | ) | |
| | ) | |
| (Shives, Inc., | ) | Honorable |
| | ) | Thomas A. Keith, |
| Third-Party Defendant-Appellant and | ) | Judge, presiding. |
| Cross-Appellee). | ) | |

PRESIDING JUSTICE CARTER delivered the judgment of the court, with opinion.
Justice McDade concurred in the judgment and opinion.
Justice Holdridge specially concurred, with opinion.

**OPINION**

¶ 1     The petitioner, Julie A. Schmidgall, filed a third-party complaint pursuant to section

35(a) of the Income Withholding for Support Act (Act) (750 ILCS 28/35(a) (West 2014)) against

third-party defendant, Shives, Inc. (Shives), alleging that Shives knowingly failed to withhold

money owed for child support and maintenance payments from the wages of her ex-husband, the respondent, Troy T. Schmidgall, in accordance with an order/notice to withhold income for support (Notice to Withhold). The trial court assessed statutory penalties against Shives pursuant to section 35(a) of the Act, in the amount of $66,700. Shives appeals, arguing that no penalties should have been assessed because there was not proper service of the Notice to Withhold in order for section 35(a) penalties to be imposed. On cross-appeal, Julie argues the trial court erred in calculating the penalties assessed against Shives, contending that the penalties imposed should have been $150,000. We affirm as modified in part, vacate the trial court's order imposing $66,700 in penalties against Shives, and remand with directions for the trial court to recalculate the penalties in accordance with this opinion.

¶ 2                                                                              FACTS

¶ 3         Julie and Troy were married on August 29, 2002, and had five children during their marriage. The trial court entered a judgment of dissolution of their marriage on May 19, 2014. Julie was awarded custody of the children. The dissolution judgment ordered the payor of maintenance and child support (Troy) to pay maintenance and child support to the State Disbursement Unit for collection and distribution to the person entitled to payments.

¶ 4         Under Julie and Troy's marital settlement agreement, Troy was to pay Julie $1400 per month in child support ($700 on the fifteenth and thirtieth of each month) and was to instruct his employer to write a check in the proper amount and send it to the State Disbursement Unit on his regular payday if his employer was not subject to a Notice to Withhold and, any time support was not withheld from Troy's check, Troy "shall personally make payment to the State Disbursement Unit." The marital settlement agreement indicated that Troy "shall pay" Julie

2

$412.50 per month in maintenance ($206.25 on the fifteenth and thirtieth of each month), with no specific reference to the State Disbursement Unit.

¶ 5 On May 19, 2014, the trial court entered a uniform order for support, finding that Troy's net monthly income was $2932.13 and ordering Troy to make child support and maintenance payments beginning on May 15, 2014, by sending the payments to the State Disbursement Unit and that a notice to withhold income "shall issue immediately and shall be served on [Troy's] employer."

¶ 6 On June 27, 2014, Julie's attorney filed a "certificate of service," in which she certified that she sent, via certified mail on May 28, 2014, a copy of the uniform order for support and a Notice to Withhold to Troy's employer—"Shives, Inc., Attn: Payroll, 241 Ford Avenue, Hopedale, Illinois, 61747"—and it was returned to sender as "refused." Julie's attorney attached a copy of the returned certified mailing envelope, which indicated a "1st notice" on May 31, 2014, a "2nd notice" on June 15, 2014, and a return to sender "refused" date of June 25, 2014. On June 27, 2014, Julie's attorney had received the certified mailing back as "refused."

¶ 7 On December 15, 2014, Julie filed a motion to add as third-party defendants Shives (Troy's employer) and individually, Dwayne Schmidgall (president of Shives/Troy's father). Julie argued that Shives had been properly served with the Notice to Withhold and willfully failed to comply, noting that to date no funds had been forwarded to the State Disbursement Unit. The trial court granted Julie's motion to add Shives as a third party but reserved its ruling as to Dwayne, individually.

¶ 8                                  I. Third-Party Complaint

¶ 9 On March 6, 2015, Julie filed a third-party complaint against Shives, with the Notice to Withhold attached as an exhibit. Julie specified that she had sent the Notice to Withhold to

3

Shives via certified and regular mail on May 28, 2014, with the certified mailing returned to her as refused. Pursuant to section 35(a) of the Act, an employer who has been served with an income withholding notice has a statutory duty to deduct the designated amount no later than the next payment of income 14 days following the date the income withholding notice was mailed. See *id.* The employer then has to make the payment to the State Disbursement Unit within 7 business days after the date the amount would have been paid the obligor-employee, with the knowing failure to do so resulting in a penalty of $100 for each day the designated amount is not paid to the State Disbursement Unit after the 7 business day grace period expired. See *id.* Julie indicated that she did not receive payments from the State Disbursement Unit until February 5, 2015, when she received a payment in the amount of $906.25. Julie requested a judgment against Shives "in the total amount of statutory penalties" for its willful failure to comply with the Act.

¶ 10                                    II. Trial

¶ 11          At a bench trial on the third-party complaint, the trial court took judicial notice of the judgment for the dissolution of marriage, with the attached marital settlement agreement and uniform order of support. The trial court also took judicial notice of the certificate of service that was filed by Julie's attorney on June 27, 2014, and the affidavit of the process server showing that on January 8, 2015, Shives was served with the motion to add Shives as a third-party defendant. The Notice to Withhold was attached as an exhibit to the motion. Evidence at trial showed that the first payment Julie received from the State Disbursement Unit was on February 5, 2015.

¶ 12                              A. Testimony of Paralegal

¶ 13          Christina Rook, a paralegal at the law firm of Julie's attorney, testified that she prepared the certified mailing return receipt request and sent a file-stamped copy of the uniform order for

4

support and a copy of the Notice to Withhold to Shives via the certified mailing on May 28, 2014. The envelope for the certified mailing of May 28, 2014, showing the sender was the law firm of Julie's attorney, was entered into evidence with the green certified mailing return receipt unsigned and still attached to the envelope. Christina testified that the certified letter was returned to the law firm as "refused" on June 27, 2014, with the original contents still in the envelope. Julie's attorney instructed Christina to mail, via regular mail, another copy of the uniform order for support and Notice to Withhold, which Christina did on or around June 27, 2014. The regular mailing of June 27, 2014, was never received back as undelivered.

¶ 14        Christina testified that on August 14, 2014, she sent another regular mailing and certified mailing to Shives, which showed the sender as the law firm of Julie's attorney and containing a letter to Shives and the Notice to Withhold. The regular mailing was not returned to sender, but the certified mailing was returned as "unclaimed" on September 15, 2014. The letter in those mailings had indicated that enclosed was a Notice to Withhold pursuant to a uniform order for support that had been entered on May 19, 2014, and requested that Shives "immediately" begin withholding from Troy's pay "the sum of $906.25 per semi-monthly pay period for current child support and maintenance" and that all payments should be made payable to and sent to the State Disbursement Unit, with the address for the State Disbursement Unit provided. The letter made no reference to any arrearages, Julie not receiving any prior payments, or the date or dates that Shives should have made previous payments. On September, 15, 2014, the certified mailing of August 14, 2014, was returned to the law firm of Julie's attorney as "unclaimed." The envelope for the certified mailing of August 14, 2014, and contents of the envelope were entered into evidence, with the green certified mailing return receipt unsigned and still attached to the envelope. The markings on the envelope indicated a first notice date of August 16, 2014, a

5

second notice date of August 21, 2014, and a return to sender as "unclaimed" date of September 2, 2014.

¶ 15        Christina testified that prior to the dissolution judgment being entered by the trial court, the law firm of Julie's attorney had served Shives with a subpoena for Troy's employment records. Christina spoke with Thelma Reed, who was the secretary of Shives, several times to obtain compliance with the subpoena. Christina testified that the law firm of Julie's attorney had Shives served with a notice of hearing and the motion to add Shives as a third-party defendant in this case. The trial court took judicial notice of the affidavit of the special process server indicating service on January 8, 2015.

¶ 16        Christina further testified that due to the certified mailings being returned, she did a "postal trace" on April 2, 2015, to verify the mailing address for Shives which showed the post office box for Shives was linked with Shives's physical address of 241 Ford Avenue, Hopedale, Illinois, 61747. The request form that had been submitted to the Hopedale postmaster for information regarding Shives's physical address and post office box was submitted as evidence. Christina confirmed that she verified the address of Shives as 241 Ford Avenue, Hopedale, Illinois, 61747, from the subpoena that had been served on Shives for Troy's employment records during the dissolution proceedings. Christina also testified that the data sheet attached to the uniform order for support, whitepages.com, and a Google computer search all indicated that the physical address for Shives was 241 Ford Avenue, Hopedale, Illinois, 61747.

¶ 17                        B. Testimony of Postmaster of Hopedale Post Office

¶ 18        The evidence deposition of the postmaster of the Hopedale post office, Kim Costa, was introduced into evidence. Kim testified she has been an employee of the United States Postal Service for 24 years and served as a postmaster for 11 years (three years as the postmaster in

6

Hopedale, Illinois). Kim was familiar with Shives's post office box that was located inside the Hopedale post office. Kim testified that for every post office box at the Hopedale post office there was an associated physical address in the computer system. If a piece of mail, including certified mail, was addressed to Shives at their physical address in Hopedale, Illinois, it is delivered to Shives's post office box. With a certified letter, a postal employee would fill out a notice that indicated the post office was holding a certified piece of mail that needed to be signed for, the date the certified mail was received in the post office, and the sender's name. The notice would then be placed in the post office box of the addressee. A regular piece of mail that was not certified would be placed directly in the post office box because no signature was required. Kim defined "refused mail" as the addressee refusing to accept that particular piece of mail by either writing "refused" on the piece of mail and placing it in the outgoing mail or by bringing it to a post office employee and indicating that it was being refused so that the post office employee would write "refused" on it before it was returned to the sender. When a certified letter came into the post office, a notice was placed in the post office box the first day, a second notice was issued five days later indicating the mail will be returned if it was not claimed, and a final notice is issued the 10th day, with the certified letter returned to the sender as "unclaimed" at the close of business if it was not claimed.

¶ 19     With a certified letter, the addressee or a person with a key to the post office box of the addressee could look at the notice for the certified letter, hand the notice to a post office employee, and inform the employee that the certified mail was being refused. In most incidents, either Kim or one of the three other employees of the post office would write the word "refused" on the envelope. Kim did not recall who refused the certified letter of May 28, 2014, at issue in this case, but the word "refused" was written on the letter in Kim's handwriting. Kim testified

7

that there would be no circumstance under which she would write the word refused on an envelope if the addressee or the representative of the addressee had not indicated it was being refused. Kim testified, "I would never refuse a letter that's not mine."

¶ 20                                C. Motion for Directed Verdict

¶ 21        Shives motioned the trial court for a directed verdict, arguing that section 35(a) of the Act (*id.*), under which Julie was requesting statutory penalties, required a finding of the payor's nonperformance to be "documented by a certified mail return receipt or a sheriff[ ] or private process server[ ]." The attorney for Shives argued that the applicable statute was "very clear that there are only two ways in which someone can be served and held accountable"—by proof of a certified receipt showing a signature for the document or by proof that a private process server or sheriff physically served the papers. Julie's attorney argued that Shives should be charged with "constructive receipt" of the documents contained in the certified mailing because Shives was familiar with her office as representing Julie during Julie and Troy's divorce proceedings and Shives refused the certified mailing from her law office. The trial court denied Shives's motion for directed verdict.

¶ 22                                D. Secretary of Shives

¶ 23        Shives's attorney called Thelma Reed, the corporate secretary/treasurer of Shives to testify. Thelma testified that she was a corporate officer of Shives and had worked for Shives since 1978, becoming an officer or director of Shives shortly thereafter. As part of her duties, Thelma was in charge of payroll. She had received notices to withhold for two other employees, but those employees had brought the paperwork to her. Thelma was aware that Troy and Julie were going through divorce proceedings. Thelma was provided with a copy of the notice to withhold by Dwayne in late December 2014 or in January 2015, after Dwayne had placed the

8

notice on her desk. Those papers consisted of two or three pages. Dwayne had told Thelma that he had been served with a subpoena the prior Saturday. Thelma did not receive the motion to add Shives as a third-party defendant with the Notice to Withhold papers that Dwayne had placed on her desk. Thelma began deducting the amount indicated in the Notice to Withhold the next payroll period. Thelma had never received any other notice to withhold. Thelma testified that she had never refused any mailings from the law firm of Julie's attorney and all mail for Shives went to the post office. She indicated that Dwayne generally picked up the mail from the post office, but other employees—Clint Gordon, Kelly Bell, or Sarah Schmidgall (Dwayne's daughter)—had also occasionally picked up the mail when Dwayne or Thelma gave them the key to do so. Dwayne and Thelma were the only two persons who had keys to the post office box. Thelma did not recall having any contact with or speaking with anyone from the law firm of Julie's attorney during Troy and Julie's divorce proceedings. Thelma indicated that Troy had requested his employment records during the divorce proceedings but she was never given a subpoena for those records.

¶ 24        Thelma testified that Troy has worked for Shives since he was 18 years old and Troy was one of Dwayne's sons. Thelma testified that it was mostly only her that worked in her office, but she occasionally had some part-time help. Thelma would be the person that would be served by a process server during normal business hours (9 a.m. to 5 p.m.). In 2014, Shives employed eight or nine people.

¶ 25                                E. President of Shives

¶ 26        Dwayne testified that he purchased Shives in 1977 and had since been the president of the corporation. Dwayne was served with papers by a process server in late December 2014 or early January 2015. He signed for the papers and laid them on Thelma's desk without looking at

9

the documents. Dwayne testified that he never refused any certified mail from the law firm of Julie's attorney. He acknowledged that he "well [knew]" the law firm. Dwayne testified that he never received a Notice to Withhold pertaining to Troy. Dwayne was waiting for Troy to bring in the Notice to Withhold but Troy never did. Dwayne testified that he never knowingly failed to withhold income from Troy's check for child support or maintenance. Dwayne was aware that Troy and Julie were getting a divorce but was not aware of the details of the proceedings because he did not want anything to do with it. Dwayne testified that Shives had paid for Troy's attorney fees during the dissolution proceedings when the bills arrived because Troy was "lax" about paying his bills, but Troy did not discuss the details of the proceedings with Dwayne. Dwayne knew that Troy would have to pay child support. Dwayne acknowledged that he knew which law firm represented Julie during the divorce proceedings. Dwayne did not know when the divorce was finalized. Dwayne testified that he did not get involved with withholding child support or maintenance payments because Thelma "does all that." Dwayne testified that he never received a Notice to Withhold other than the copy he received in late December 2014 or January 2015 (when he was served with the motion to add Shives as a third-party defendant). Dwayne also testified that most of the time he is the person who picked up the mail from Shives's post office box.

¶ 27                                     F. Julie Schmidgall

¶ 28            Julie testified that the dissolution judgment was entered on May 19, 2014, and pursuant to the order Troy was required to pay child support, maintenance, and medical expenses for the children. Julie testified that Troy periodically sent support payments directly to her. She testified, "I didn't know when it was going to come. It was supposed to be on a schedule *** through the

10

SDU, but so he would pay me here and there." Julie testified that Troy began to fall behind in payments, she took him back to court, and he caught up on everything.

¶ 29    On December 15, 2014, Julie had filed a petition for rule to show cause alleging that Troy failed to pay his portion of the children's medical expenses and school registration fees, failed to establish and maintain an account with the State Disbursement Unit, and failed to instruct his employer to withhold child support and maintenance payments and to forward those payments to the State Disbursement Unit. Julie testified that she had attached an affidavit and exhibit to the petition for rule to show cause, which showed that Troy had made payments directly to Julie for child support and maintenance in the amount of $1812.50 on June 5, 2014; $1812.50 on July 3, 2014; $1812.50 on August 3, 2014; $1812.50 on September 1, 2014; and $1812.50 on October 4, 2014. There was no indication regarding November or December payments for 2014, but Julie acknowledged that when she filed the petition for rule to show cause on December 15, 2014, Troy was not far behind in his child support and maintenance payments. The trial court took judicial notice of the order resulting from the petition for rule to show cause entered on February 23, 2015, indicating Troy was in contempt of court per Julie's petition for rule to show cause and indicating that Troy was to purge the contempt by paying $1500 of Julie's attorney fees pertaining to the rule to show cause. There was no indication in the order that Troy was delinquent in his child support payments or maintenance payments or that there was any arrearage owed to Julie.

¶ 30                    G. Trial Court's Ruling

¶ 31    In ruling, the trial court found Christina, the paralegal for Julie's attorney, was credible. The trial court did not believe that Dwayne was not aware "of any of this," noting that Dwayne knew Troy had to pay child support. The trial court found that Dwayne "knew exactly what this

11

was all about," was astute, and was more involved than he indicated when he testified. The trial court found that Dwayne "knew exactly what was in those mailings," knew where it was coming from, and affirmatively rejected the mail. The trial court noted that Dwayne rejected the certified mail but had received the other mailings, with all the mailings going to the same mailbox. The trial found that the mailings were delivered, Christina was credible in her testimony, and there had been prior contact between Shives and the law firm of Julie's attorney. The trial court noted that Thelma testified that she did not receive the motion to add Shives as a third-party defendant or Julie's petition for rule to show cause when she received the Notice to Withhold in December 2014 or January 2015, which the trial court found gave rise to an inference that the Notice to Withhold that Thelma was given "was one of the previous mailings, probably one of the regular mail mailings." The trial court found that Dwayne knew what was in the mailings, Dwayne had affirmatively refused the certified mailing containing the Notice to Withhold, and Dwayne had received the Notice to Withhold through regular mail. The trial court also did not believe that an employee sent to pick up the mail would have withheld any of the regular mailings that would have been delivered to Shives's post office box. The trial court found that Dwayne went to the post office to pick up the mail almost every day and on the rare occasion when someone else did so, either Dwayne or Thelma had to give them the key. The trial court found that only when there was the threat of litigation of the motion to add Shives as a third-party defendant was the Notice to Withhold taken seriously. The trial court found that there were three dates of mailing of the Notice to Withhold in May, June, and August 2014, and the trial court imputed knowledge of the Notice to Withhold to Shives through the regular mailing of August 14, 2014.

¶ 32     The trial court held a separate hearing to determine the amount of the penalties to impose upon Shives. Julie argued the first applicable pay period for Shives to have withheld payments

12

was June 15, 2014, after the initial certified mailing was sent on May 28, 2014, so that under section 35(a) of the Act the $100-dollar-per-day penalty would begin seven business days later on June 25, 2014. Julie argued that, thereafter, Shives did not withhold and submit payment to the State Disbursement Unit until Troy's paycheck of January 30, 2015, creating 15 occasions of nonperformance. Julie argued that because Shives did not go back and "cure anything" (by paying all the payments that it should have made under the Notice to Withhold) the maximum penalty for each of the 15 pay periods of nonperformance was applicable and, but for the statutory limit of $10,000, Shives would be incurring penalties to this day. Julie argued for a $150,000 penalty because there had been 15 pay periods that Shives knowingly failed to comply with the Notice to Withhold, with the maximum penalty for each occurrence of nonperformance limited to $10,000. In response, Troy argued that there was "no cure available" because Troy had already paid Julie child support and maintenance, so that "[t]here is nothing to cure."

¶ 33        The trial court indicated that because it had found that Shives had notice of its duty to withhold as of the regular mailing of August 14, 2014, the first applicable pay period for Shives to have withheld payments was August 30, 2014, so that there were 10 pay periods for which Shives failed to comply with the Notice of Withhold. The trial court found that the $100-per-day penalty was to stop on January 30, 2015, when Shives first complied with the Notice to Withhold. The trial court assessed a penalty of $66,700 against Shives.

¶ 34        Shives filed a motion to reconsider, arguing that the trial court's finding of its nonperformance was not documented by a certified mail return receipt or a process server's proof of service showing the date the income withholding notice was served as required by section 35(a) of the Act in order for the $100-per-day penalty to be imposed. The trial court denied Shives's motion to reconsider.

13

¶ 35    Shives appealed. Julie cross-appealed.

¶ 36                                    ANALYSIS

¶ 37    On appeal, Shives argues that no penalties should have been assessed against it because service of the Notice to Withhold was not properly made in accordance with the requirements of section 35(a) of the Act (*id.*), under which the penalties against Shives were imposed by the trial court. Julie argues that service on Shives of the Notice to Withhold was effectuated via the certified mailing of May 28, 2014, which had been refused by Shives.

¶ 38    Julie additionally filed a cross-appeal, arguing the trial court erred in calculating the penalty assessed against Shives. Specifically, Julie argues that the $100-per-day penalty under section 35(a) of the Act is mandatory and the penalty should have been assessed seven business days after the pay period of June 15, 2014, so that the initial $100-per-day penalty would have started accruing on June 25, 2014, with similar $100 penalties accruing for every pay period of noncompliance thereafter. Julie further argues that the trial court erred finding the penalties stopped accruing when Shives started withholding for the first time on January 30, 2015, contending that the penalties should have accrued until Shives remitted each and every payment to the State Disbursement Unit. Shives responds to Julie's argument on cross-appeal by reiterating its argument that it had not been properly served in accordance with section 35(a) of the Act and, therefore, "the actual penalty under the [A]ct is zero."

¶ 39    We review the legal effect of undisputed facts and the trial court's interpretation of a statute *de novo*. *In re Marriage of Chen*, 354 Ill. App. 3d 1004, 1011 (2004). As for disputed facts, we will not disturb the findings of the trial court, as the trier of fact without a jury, unless the findings are against the manifest weight of the evidence. *Id.*

                                        14

¶ 40       The fundamental rule of statutory construction is to ascertain and give effect to the intent of the legislature. *Schultz v. Performance Lighting, Inc.*, 2013 IL 115738, ¶ 12. The best indicator of the legislature's intent is the statutory language itself, given its plain and ordinary meaning. *Id.* We consider the statute in its entirety, bearing in mind the subject it addresses and the apparent intent of the legislature in enacting the statute. *Id.* To the extent there is any ambiguity, penal statutes and statutes that create "new liabilities" should be strictly construed in favor of persons sought to be subjected to their operation and will not be extended beyond their terms. *Id.* (citing *Nowak v. City of Country Club Hills*, 2011 IL 111838, ¶¶ 19, 27 (a statute creating a new liability is strictly construed in favor of the entity subjected to the liability)). Statutes in derogation of the common law are also strictly construed in favor of persons sought to be subjected to their operation. *Id.*

¶ 41               I. Proof of Service Under Section 35(a) of the Act

¶ 42       Shives argues that in order for penalties to have been imposed pursuant to section 35(a) of the Act, its nonperformance had to be documented by certified mail return receipt or a sheriff's or private server's proof of service showing the date the Notice to Withhold was served.

¶ 43       Section 35(a) of the Act provides as follows:

> "(a) It shall be the duty of any payor who has been served with an income withholding notice to deduct and pay over income as provided in this Section. The payor shall deduct the amount designated in the income withholding notice *** beginning no later than the next payment of income which is payable or creditable to the obligor that occurs 14 days following the date the income withholding notice was mailed, sent by facsimile or other electronic means, or placed for personal delivery to or service on the payor. *** The payor shall pay the amount

15

withheld to the State Disbursement Unit within 7 business days after the date the amount would *** have been paid or credited to the obligor. *If the payor knowingly fails to withhold the amount designated in the income withholding notice or to pay any amount withheld to the State Disbursement Unit within 7 business days after the date the amount would have been paid or credited to the obligor, then the payor shall pay a penalty of $100 for each day that the amount designated in the income withholding notice (whether or not withheld by the payor) is not paid to the State Disbursement Unit after the period of 7 business days has expired.* The total penalty for a payor's failure, on one occasion, to withhold or pay to the State Disbursement Unit an amount designated in the income withholding notice may not exceed $10,000. The failure of a payor, on more than one occasion, to pay amounts withheld to the State Disbursement Unit within 7 business days after the date the amount would have been paid or credited to the obligor creates a presumption that the payor knowingly failed to pay over the amounts. This penalty may be collected in a civil action which may be brought against the payor in favor of the obligee or public office. An action to collect the penalty may not be brought more than one year after the date of the payor's alleged failure to withhold or pay income. *A finding of a payor's nonperformance within the time required under this Act must be documented by a certified mail return receipt or a sheriff's or private process server's proof of service showing the date the income withholding notice was served on the payor.* For purposes of this Act, a withheld amount shall be considered paid by a payor on the date it is mailed by the payor, or on the date an electronic funds transfer of

16

the amount has been initiated by the payor, or on the date delivery of the amount

had been initiated by the payor." (Emphases added.) 750 ILCS 28/35(a) (West

2014).

¶ 44    The language of Section 35(a) of the Act places a statutory duty on a payor who has been

served with an income withholding notice to deduct and pay over income to the State

Disbursement Unit the amount designated in the income withholding notice. *Id.* Under Section

35(a) of the Act, a $100-per-day penalty is imposed on a payor who "knowingly fails" to

withhold the income of an obligor as directed under a income withholding notice where either a

certified mail return receipt or a process server's proof of service shows the date the Notice to

Withhold was served on the payor. *Id.*

¶ 45    In this case, the evidence showed that the officers of Shives (Dwayne and Thelma) knew

that Troy and Julie were getting a divorce and that Troy would have to pay child support. While

there is question of proof of service in regard to proof of the date of service for section 35(a)

penalties, the evidence shows that under section 20(g) of the Act, Shives had received actual

notice of its duty to withhold when the Notice to Withhold was sent via regular mail on May 28,

2014, which was addressed to Shives and to the attention of "payroll" and which indicated it was

sent from the law firm of Julie's attorney. See *id.* § 20(g) (the obligee or public office may serve

the income withholding notice on the payor by ordinary mail). On the same day that the regular

mailing was sent, a similar envelope was sent to Shives via certified mail. The regular mailing,

along with the notice for the certified mailing, would have been placed into Shives's post office

box, with the certified mailing notice indicating the sender was the law firm of Julie's attorney.

The certified mailing notices were placed in Shives's post office box on May 31, 2014, and on

June 15, 2014, with Shives eventually refusing the certified mailing on or about June 25, 2014,

17

almost a month after it was mailed. The postmaster would not have written "refused" on the certified mailing envelope unless someone who had received the notice from the post office box of Shives had instructed her to do so. Only officers of Shives (Dwayne and Thelma) had keys to the post office box. Based on these facts, the trial court's finding that the certified mailing on May 28, 2014, was sent to Shives but affirmatively refused by Shives was not against the manifest weight of the evidence.

¶ 46        In reviewing the record in this case, we conclude that there was sufficient proof within meaning of section 35(a) of the Act that Shives was served with the Notice to Withhold via the certified mailing of May 28, 2014, where the evidence showed that Shives knew that it would have to withhold income for Troy as support payments resulting from his divorce from Julie; Shives had been sent a regular mailing to the attention of its payroll department containing the Notice to Withhold; Shives knew, by way of the notices in the post office box, that the law firm of Julie's attorney was attempting to send its payroll department a certified letter (at the same time the Notice to Withhold was sent via regular mail and presumably also placed in the post office box); and Shives refused the certified mailing. See *Helland v. Larson*, 138 Ill. App. 3d 1, 4-5 (1985) (deeming a tenant to be in constructive receipt of a notice to terminate his tenancy and finding the owners complied with the applicable statute requiring a return receipt from the addressee as constituting proper notice where the tenant was aware that he would be sent a notice of termination, the postal service notified the tenant of the certified letter, and the tenant did not pick up the certified letter at the post office). Consequently, the trial court's finding that Shives did not have notice of its duty to withhold until August 14, 2014, was against the manifest weight of the evidence where, as discussed, the evidence showed that Shives was properly served within meaning of section 35(a) of the Act via the certified mailing of May 28, 2014, with the

first applicable pay period of withholding on June 15, 2014. Accordingly, we affirm the trial court's finding that Shives was properly served with the Notice to Withhold in accordance with section 35(a) of the Act but modify the date Notice to Withhold was served on Shives for section 35(a) purposes to May 28, 2014—the date the "refused" certified mailing was sent to Shives and addressed to the attention of "payroll."

¶ 47    In concluding that the $100-per-day penalty was triggered on May 28, 2014, we note that Shives did not raise any issue, either in the trial court or on appeal, with respect to the validity of the Notice to Withhold. Under the Act, the "obligee" (Julie) was required to serve the Notice to Withhold on the payor (Shives) and the obligor (Troy) (see 750 ILCS 28/20(g) (West 2014)), with certain information included. See *id.* § 20(c); *Schultz*, 2013 IL 115738, ¶¶ 14-15 (the obligee's signature is the only requirement under section 20(c) of the Act that is expressly deemed an exception from affecting the validity of the notice of withholding). Our review of the record indicates that the duties of the payor and the fines and penalties for a failure to withhold were provided in the Notice to Withhold, but this information was not set forth "in bold face type," as required under the amendments to the Act that had become effective on August 17, 2012. See 750 ILCS 28/20(c)(7) (West 2014) (providing that the income withholding notice shall "in bold face type, the size of which equals the largest type on the notice, state the duties of the payor and the fines and penalties for failure to withhold and pay over income"). The consequence for failing to comply with the requirements of section 20(c) of the Act (other than the signature requirement of section 20(c)(11)) is that the notice be rendered invalid. *Schultz*, 2013 IL 115738, ¶¶ 14-15. However, since no issue with respect to the validity of the notice has been raised, the notice has implicitly been conceded to be valid. See *id.* ¶ 27 (noting that no issue with respect to the validity of the notice was raised in the case of *In re Marriage of Gulla*, 382

19

Ill. App. 3d 498, 502-03 (2008), so that the notice was conceded to have been valid). Consequently, we take no position on whether the failure to provide the requisite bold-face type in the Notice to Withhold would render the notice invalid.

¶ 48    We further note that also effective August 17, 2012, subsection 45(j) was added to the Act, which provides:

> "If an obligee who is receiving income withholding payments under this Act does not receive a payment required under the income withholding notice, he or she must give written notice of the non-receipt to the payor. The notice must include the date on which the obligee believes the payment was to have been made and the amount of the payment. The obligee must send the notice to the payor by certified mail, return receipt requested." 750 ILCS 28/45(j) (West 2014).

¶ 49    Under section 45(j), the obligee has a statutory duty to provide written notice of nonpayment to the payor. See *id.* After receiving a written notice of nonreceipt of payment, the payor "must," within 14 days, either notify the obligee of the reason for the nonreceipt of payment or make the payment, with 9% interest calculated from the date on which the payment of income should have been made, with the payor's failure to do so resulting in the payor being subject to the $100-per-day penalty provided in section 35(a) of the Act. *Id.* Here, Julie failed to provide proper written notice to Shives of her nonreceipt of payments following the initial certified mailing of the Notice to Withhold. Presumably, Julie did not give notice to Shives that she did not receive a payment as required Notice to Withhold because she did, in fact, receive the payment directly from Troy. Nonetheless, Shives does not raise the issue of whether Julie's failure to provide written notice of nonreceipt of payment pursuant to section 45(j) should preclude Julie from seeking the $100-per-day penalty and, therefore, we will not address the

20

issue. For this reason, we also take no position on whether section 45(j) of the Act requires a written notice to be sent to the payor for each separate pay period where the obligee did not receive payment.

¶ 50                               II. $100-Per-Day Penalties

¶ 51        On cross-appeal, Julie disputes the amount of penalties imposed by the trial court against Shives arguing the $66,700 in penalties should have been $150,000. Shives responds by contending that service of the Notice to Withhold in order for section 35(a) penalties to be imposed was not proper and, therefore, no penalties should have been imposed. As discussed above, we reject the argument of Shives regarding service and affirm the trial court's finding that there was proof of service as require by section 35(a), as modified to the effective date of May 28, 2014.

¶ 52        Under section 35(a) of the Act,

> "[i]f the payor knowingly fails to withhold the amount designated in the income withholding notice or to pay any amount withheld to the State Disbursement Unit within 7 business days after the date the amount would have been paid or credited to the obligor, then the payor shall pay a penalty of $100 for each day that the amount designated in the income withholding notice (whether or not withheld by the payor) is not paid to the State Disbursement Unit after the period of 7 business days has expired." *Id.* § 35(a).

The $100-per-day penalty is assessed for each violation of the Act. *In re Marriage of Miller*, 227 Ill. 2d 185, 194 (2007). " 'A separate violation occurs each time an employer knowingly fails to remit an amount that it has withheld from an employee's paycheck.' " *Id.* (quoting *Grams v. Autozone, Inc.*, 319 Ill. App. 3d 567, 571 (2001)).

21

¶ 53 Our supreme court has provided an example for calculating the penalties for multiple violations by stating:

"To illustrate: If an employee is paid weekly, and the employer fails to remit child support withheld from the employee's paycheck in week one, the employer is subject to a penalty at the rate of $100 per day. If the employer also fails to remit the next support payment withheld in week two, and the first payment is still outstanding, the employer is subject to two $100 penalties each day that both payments remain outstanding." *Id.*

¶ 54 In *Miller*, the employer was subject to numerous $100 penalties on any given day because he was frequently several weeks in arrears with turning over child support payments withheld from his employee's wages—"one for each support payment he had failed to remit"— so that over the course of 2½ years, the employer was able to accumulate 11,721 penalties, ultimately resulting in a judgment against him in the amount of $1,172,100. *Id.*[1] The supreme court noted that the employer could have avoided the imposition of any penalties simply by complying with his statutory obligation and it was the employer who controlled the extent of the penalty. *Id.* at 202. The supreme court in *Miller* reversed the judgment of the appellate court and affirmed the judgment of the circuit court entered against the employer for $1,172,100 in statutory penalties. *Id.* at 206.

¶ 55 In this case, Shives failed to withhold support from Troy's wages on 15 applicable pay periods, beginning with the pay period of June 15, 2015. The issue to be determined in this case, however, is at what point should the $100-per-day penalties stop being assessed against Shives

___

[1]Subsequent to *Miller*, the legislature amended section 35(a) of the Act to limit the total penalty to $10,000 for a payor's failure, on one occasion, to withhold or pay over to the State Disbursement Unit an amount designated in the income withholding notice. See 750 ILCS 28/35(a) (West 2014).

for Shives knowingly failing to withhold support from Troy's wages. The Act does not define the term "knowingly." Section 35(a) provides, "a withheld amount shall be considered paid by payor on the date it is mailed by the payor, [or when an electronic funds transfer has been initiated], or on the date delivery of the amount has been initiated by the payor." However, the Act is silent as to the scenario that has arisen in this case, wherein an obligee (Julie) has repeatedly accepted direct payments from the obligor (Troy) rather than receiving payments through the State Disbursement Unit but still seeks $100-per-day penalties against the payor/employer (Shives) for its failure to withhold and turn over payments to the State Disbursement Unit, even for the time after the obligee (Julie) had accepted those funds directly from the obligor (Troy).

¶ 56    The $100-per-day penalty provision under which Julie is seeking $100-per-day penalties against Shives was enacted to ensure a simple and speedy method of withholding wages in response to the nationwide crisis of delinquent child support. *Chen*, 354 Ill. App. 3d at 1015 (citin*g Dunahee v. Chenoa Welding & Fabrication, Inc.*, 273 Ill. App. 3d 201, 205 (1995)). The purpose of allowing a plaintiff to recover the $100-per-day penalty for each day of a knowing violation is to punish parties that violated the Act and to discourage future violations. *In re Marriage of Murray*, 2014 IL App (2d) 121253, ¶ 45. Given that section 35(a) is penal in nature and creates a new liability on the part of payor, we will strictly construe the Act in favor of the persons sought to be subjected to its operation and will not extend the Act beyond its terms. See *Schultz*, 2013 IL 115738, ¶ 12.

¶ 57    In looking to the Act in its entirety, we note that section 20 of the Act requires that a withholding notice be prepared and served immediately upon the payor by the obligee, "unless a written agreement is reached between and signed by both parties providing for an alternative arrangement, approved and entered into the record by the court, which ensures payment of

23

support." 750 ILCS 28/20(a)(1) (West 2014) (where a court-approved written agreement for an alternative arrangement is in place, the order for support shall provide that an income withholding notice is to be prepared and served only if the obligor becomes delinquent in paying the order for support). Section 20(c)(12) of the Act mandates that the income withholding notice "direct any payor to pay over amounts withheld for payment of support to the State Disbursement Unit." *Id.* § 20(c)(12).

¶ 58 In this case, the withholding notice and the underlying support order both indicated that the support payments were to be paid over to the State Disbursement Unit, with the uniform order for support specifying that payments made by Troy should be made payable to and forwarded to the State Disbursement Unit. Julie testified that Troy paid her directly and she accepted those payments, although no approved written agreement was in place for such an arrangement and despite the support order and Notice of Withholding directing the support payments to be made through the State Disbursement Unit. While there is no indication that Shives knew Julie had been paid directly by Troy, it was Julie's statutory duty, pursuant to section 45(f), to provide Shives with such notice. See *id.* § 45(f) (providing, "[t]he obligee or public office shall provide notice to the payor and Clerk of the Circuit Court of any other support payment made, including but not limited to, a set-off under federal and State law or partial payment of the delinquency or arrearage, or both"). There also is no indication that Julie provided notice of nonpayment to Shives pursuant to section 45(j) of the Act. See *id.* § 45(j).

¶ 59 Under our reading of the Act, strictly construing the Act in favor of Shives and not extending the Act beyond its terms, we must disagree with Julie's position that Shives should continue to be assessed $100-per-day penalties for each period of nonperformance until Shives forwards every payment to withhold to the State Disbursement Unit that it had failed withhold

24

and forward previously, even though Julie had already accepted those payments directly from Troy and failed to provide notice to Shives pursuant under section 45(f) regarding her receipt of those payments or notice to Shives pursuant section 45(j) upon any initial nonreceipt of payment. See *id.* §§ 45(g), 45(j). Thus, based on the circumstances of this case, when we construe section 35(a) strictly in favor of Shives, we cannot say that Shives "knowingly" failed to withhold and pay over to the State Disbursement Unit funds after the point that Julie had accepted those same funds directly from Troy.

¶ 60        Therefore, based on the specific circumstances of this case, we hold that the imposition of the $100-per-day penalty for any of the 15 pay periods of Shives's nonperformance under the Notice to Withhold should be limited to the days that Julie went without the support payment after the statutory seven business day grace period for forwarding the payment to the State Disbursement Unit expired. See *id.* § 35(a). The uniform order of support in this case indicated that bimonthly support payments were to begin on May 15, 2014, and the evidence showed that Julie received payment from Troy on June 5, 2014, in the amount of $1812.50, presumably for the pay periods of May 15 and May 30, 2014. The Notice to Withhold was sent via certified mail to Shives on May 28, 2015, making June 15, 2014, the first applicable pay period for withholding. It does not appear that Julie received payments for the pay periods of June 15 and 30, 2014, until Troy paid her on July 3, 2014. While Julie's receipt of the payment for June 30, 2014, appears to have been within the grace period, her receipt of the payment for June 15, 2014, appears to have fallen outside the grace period, so that penalties should be assessed against Shives for the pay period of June 15, 2014. It appears that a similar scenario occurred in August, September, and October 2014, with no information in the record for November and December payments in 2014 or payment for January 15, 2015, other than Julie's testimony that by mid-

25

December 2014, Troy was not far behind in paying her. Accordingly, we vacate the judgment of the trial court imposing $66,700 in penalties against Shives and remand to the trial court for a hearing to determine the applicable 35(a) penalties to be assessed against Shives in accordance with this opinion.

¶ 61                                    CONCLUSION

¶ 62          The judgment of the circuit court of Tazewell County is affirmed as modified in part, vacated in part, and remanded with directions.

¶ 63          Affirmed as modified in part, vacated in part, and remanded with directions.

¶ 64          JUSTICE HOLDRIDGE, specially concurring.

¶ 65          I agree that the manifest weight of the evidence establishes that Shives was properly served with the Notice to Withhold (Notice) in accordance with section 35(a) of the Act (750 ILCS 28/35(a) (West 2014)) on May, 28, 2014. I therefore join the majority's modification of the trial court's judgment to reflect that service date. I also agree with the majority's judgment as to the calculation of penalties to be assessed against Shives. However, I do so for different reasons than the majority. I write separately to clarify the analysis that I believe should govern the latter issue.

¶ 66          As the majority acknowledges, Shives repeatedly violated the Notice by failing to withhold from Troy's paycheck and to pay the amounts specified in the Notice for 15 consecutive pay periods. However, because Troy paid some support payments directly to Julie during the relevant time period, and because Julie failed to notify Shives that Troy had made those payments (as required by section 45(f) of the Act (750 ILCS 28/45(f) (West 2014))), the majority suggests that Shives did not "knowingly" fail to withhold or pay the support payments that Troy ultimately made to Julie. *Supra* ¶¶ 59-60. The majority reaches this conclusion even

26

though it acknowledges that there is no evidence that Shives knew of any of Troy's payments to Julie. *Supra* ¶ 58. I disagree. In my view, the fact that Troy made certain payments directly to Julie unbeknownst to Shives does not negate the fact that Shives knowingly failed to withhold and pay the amounts specified in the Notice.

¶ 67    Nevertheless, I agree with the majority's ultimate holding that Shives should not be penalized for failing to make support payments on Troy's behalf during those time periods that Troy made support payments to Julie. Section 45(f) of the Act provides that the obligee (here, Julie) "*shall* provide notice to the payor and Clerk of the Circuit Court of any other support payment made." (Emphasis added.) 750 ILCS 28/45(f) (West 2014)). The legislature's use of the word "shall" in a statute "ordinarily connotes a mandatory obligation." *In re Marriage of Takata*, 304 Ill. App. 3d 85, 95 (1999). Moreover, section 35(a) of the Act provides, in pertinent part:

> "[i]t shall be the duty of any payor who has been served with an income withholding notice to deduct and pay over income as provided in this Section. The payor shall deduct the amount designated in the income withholding notice, *as supplemented by any notice provided pursuant to subsection (f) of Section 45*. (Emphasis added.) 750 ILCS 28/35(a) (West 2014)).

Reading these two sections together, it is not clear whether an obligee's failure to supplement a withholding notice by notifying the payor of any support payments made by other parties, as required by section 45(f), relieves the payor of its duty to make those same support payments under section 35(a). As the majority correctly notes, we must resolve any ambiguity on this issue in Shives's favor. *Supra* ¶¶ 40, 56, 59; *Schultz v. Performance Lighting, Inc.*, 2013 IL 115738, ¶ 12. Section 35(a) arguably suggests that a payor's duty to deduct and withhold payments does not extend to support payments that were or should have been included in a section 45(f) notice (*i.e.*, to amounts that an obligee had already received from some other source). Accordingly, I

27

would find that Shives was not required to withhold and pay over any amounts that Troy paid to Julie.

¶ 68     This analysis is based entirely on the Act's requirements. It does not require us to reach the counterintuitive conclusion that Julie's failure to notify Shives of the payments from Troy somehow rendered Shives's failure to withhold and pay the amounts specified by the Notice not "knowing." Rather, it allows us to find, by the plain terms of section 35(a), that Shives had no statutory duty to withhold or pay amounts that Julie received from some other source, even if the Notice erroneously suggested otherwise.

¶ 69     The majority's approach appears to be based on a desire to do equity rather than a direct application of the Act as written. Although the majority does not say so explicitly, its rather strained holding seems to be an attempt to prevent Julie from obtaining statutory penalties for Shives's nonpayment of support installments that Julie had already received from Troy, which would represent an unfair windfall to Julie. However, such considerations have no relevance to a payor's liability for penalties under section 35 of the Act. *In re Marriage of Chen*, 354 Ill. App. 3d 1004, 1018 (2004) ("the fact that the penalty assessment [under section 35] may result in a windfall to [the obligee] is irrelevant because the penalty is not related solely to the hardship she suffered"). We must base an assessment of statutory penalties on the Act's requirements, not on equitable considerations.

¶ 70     One final point bears mentioning. As the majority notes, section 45(j) of the Act, which was enacted as part of the August 17, 2012, amendments, provides that "[i]f an obligee who is receiving income withholding payments under this Act does not receive a payment required under the income withholding notice, he or she must give written notice of the non-receipt to the payor." 750 ILCS 28/45(j) (West 2014). Within 14 days of receiving such notice, the payor must either notify the obligee of the reason for non-payment or make the required payment with 9%

28

interest. *Id.* Section 45(j) states that "[a] payor who fails to comply with this subsection is subject to the $100 per day penalty provides under" section 35(a) of the Act. *Id.* In this case, Julie did not notify Shives in writing that she did not receive any of the payments required by the Notice. As the majority notes, Shives did not raise this issue as a defense to Julie's claim for penalties under section 35(a). Even if it had raised the issue, however, it would not have changed the result. Section 45(j)'s notice requirement unambiguously applies only to an obligee who "*is receiving* income withholding payments under this Act [and] does not receive a payment required under the income withholding notice." (Emphasis added.) *Id.* In other words, section 45(j) requires an obligee to send notice of nonpayment to the payor only if the obligee had previously been receiving payments from the payor but subsequently failed to receive one of the scheduled payments. In this case, Julie never received any payments from Shives during the relevant time period. (In fact, Shives never even withheld any payments from Troy's paycheck.) Thus, by its plain terms, section 45(j) does not apply here.